UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RONALD KEMONI PETERSON,

　　　　　Petitioner,

　　v.

SUSAN L. HUBBARD,

　　　　　Respondent.

No.   2:15-cv-0689 KJM KJN P

FINDINGS AND RECOMMENDATIONS

I.　　Introduction

　　　Petitioner is a state prisoner, proceeding pro se, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2009 conviction for second degree robbery and related offenses.

　　　Presently before the court is respondent's motion to dismiss the pending habeas petition as barred by the one-year statute of limitations.  Petitioner filed an opposition; respondent did not file a reply.  In response to the further briefing order, petitioner filed a supplemental opposition and exhibits; respondent filed a reply.  For the reasons set forth below, the undersigned recommends that respondent's motion to dismiss be granted.

II.　　Statute of Limitations

　　　The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which became law on April 24, 1996, imposed for the first time a statute of limitations on petitions for a writ of

1

habeas corpus filed by state prisoners.  This statute of limitations provides that:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody, pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244 (d)(1).

The relevant chronology of this case is as follows:

1.  On August 3, 2009, petitioner was convicted of second degree robbery, kidnapping to commit robbery, assault with a semi-automatic firearm, and false imprisonment.  (ECF No. 1 at 66.)  See also People v. Peterson, No. A125802, 2011 WL 1620616, at *1, 2 (Cal. Ct. App. Apr. 29, 2011).  Petitioner was sentenced to 33 years and 4 months, plus life in state prison.  Id.

2.  Petitioner appealed, and on April 29, 2011, the case was remanded to the trial court for resentencing.  (ECF No. 14-2 at 77.)  The judgment was affirmed in all other respects.  (Id.)

3.  On May 31, 2011, petitioner filed a petition for review in the California Supreme Court.  (ECF No. 14-1 at 3.)  The California Supreme Court denied the petition on July 13, 2011.[1] (ECF No. 14-1 at 2.)

4.  Petitioner was re-sentenced on September 13, 2011.  (ECF No. 29.)

---

[1]  Petitioner states that the original sentence was modified to delete the enhancement under § 12022.53(b) from count three.  (ECF No. 1 at 70.)  Amended abstracts of judgment reflect the re-sentencing.  (ECF No. 29.)  Petitioner did not appeal the re-sentencing.

5. On March 16, 2012,[2] petitioner filed a petition for writ of habeas corpus in the Solano Superior Court. (ECF No. 1 at 32.) The petition was denied on June 1, 2012. (ECF No. 14-2 at 45.)

6. On July 9, 2012,[3] petitioner filed a petition for writ of habeas corpus in the California Court of Appeal. (ECF No. 14-2 at 51.) The petition was denied on August 2, 2012, with a citation to <u>In Re Swain</u>, 34 Cal.2d 300, 303-04 (1949), as to Ground One, and <u>In Re Dixon</u>, 41 Cal.2d 756, 759 (1953), as to Ground Two.[4] (ECF No. 14-2 at 52.)

7. On October 22, 2012, petitioner filed a petition in the California Supreme Court.[5] (ECF No. 14-2 at 42.) The petition was denied on January 3, 2013. (<u>Id.</u> at 2.)

8. On January 8, 2013,[6] petitioner filed a second petition in the California Supreme Court.

---

[2] Because petitioner is proceeding pro se, he is afforded the benefit of the prison mailbox rule. <u>See</u> <u>Houston v. Lack</u>, 487 U.S. 266, 276 (1988). Under the prison mailbox rule, the date petitioner signed the petition is considered his filing date absent evidence to the contrary. <u>See</u> <u>Jenkins v. Johnson</u>, 330 F.3d 1146, 1149 n.2 (9th Cir. 2003) (date petition is signed may be considered earliest possible date an inmate could submit his petition to prison authorities for filing under the mailbox rule). Here, the signature date on the petition is March 16, 2012. (ECF No. 1 at 32.) However, the proof of service attached to the petition is dated "April 2012." (<u>Id.</u> at 34.) The exact date is left blank and the proof of service is not signed. <u>See id.</u> It appears that the date was typed on the proof of service in advance, to be filled in later, but was not updated. Thus, it is not clear if petitioner waited any time at all before turning his petition over to prison authorities for mailing. Giving petitioner the benefit of the doubt, the undersigned finds that petitioner filed the petition on the date he signed the petition.

[3] Respondent states that the petition was filed on July 23, 2012. (ECF No. 27 at 5.) Respondent did not provide a copy of the entire petition, but the petition is dated "July 9, 2012, at the top left corner of the first page. (ECF No. 14-2 at 51.) Again giving petitioner the benefit of the doubt, the undersigned finds that petitioner filed the petition on July 9, 2012.

[4] <u>Swain</u> and <u>Dixon</u> concern California state habeas pleading requirements and procedural default concepts not at issue in the instant motion. <u>See</u> <u>Curiel v. Miller</u>, 830 F.3d 864, 869 (9th Cir. 2016) (<u>Swain</u>); <u>Johnson v. Lee</u>, 136 S. Ct. 1802, 1806 (2016) (<u>Dixon</u>).

[5] Respondent claims that the petition was filed on October 25, 2012, the date the petition was received by the California Supreme Court. (ECF No. 14 at 2.) However, the proof of service is dated October 22, 2012. The undersigned finds that, under the prison mailbox rule, the petition was filed on October 22, 2012, the date the proof of service was signed.

[6] Respondent states that the petition was filed on January 11, 2013. (ECF No. 14 at 3.) But, under the mailbox rule, the undersigned finds that the petition was filed on January 8, 2013, the date the proof of service was signed. (<u>See</u> ECF No. 14-3 at 9.)

3

1   (ECF No. 14-3 at 9.)  The petition was denied on May 1, 2013, with a citation to In Re Miller, 17

2   Cal. 2d. 734, 735 (1941).[7]  (ECF No. 14-3 at 2.)

3          9.  The instant action was filed on March 24, 2015.[8]  (ECF Nos. 1; 1-1 at 6.)

4          The statute of limitations begins to run when petitioner's criminal judgment becomes

5   final.  However, where the state appellate court remands for re-sentencing, the limitations period

6   does not begin until both the conviction and re-sentencing claims are final on direct review.

7   Burton v. Stewart, 549 U.S. 147, 156-57 (2007) (per curiam).

8          Here, petitioner challenged his underlying conviction in the state appellate courts before

9   he was re-sentenced.  The California Supreme Court denied the petition for review on July 13,

10  2011.  Petitioner's conviction became final ninety days later, on October 11, 2011, when the time

11  for seeking certiorari with the United States Supreme Court expired.  See Bowen v. Roe, 188 F.3d

12  1157 (9th Cir. 1999).

13         Petitioner was re-sentenced on September 13, 2011.  (ECF No. 29 at 1.).  Where, as here,

14  a defendant's sentence is modified during the state appellate process, the judgment is not final for

15  statute of limitations purposes, even as to claims disposed of in a first round of appeals, until the

16  conclusion of direct review of the modified sentence.  Burton, 549 U.S. at 156-57.  Petitioner did

17  not appeal the modified sentence.  If the defendant does not seek review from the state's highest

18  court, the conviction becomes final when the time for seeking review expires.  Espinoza-

19  Matthews v. California, 432 F.3d 1021, 1025 (9th Cir. 2005).  Thus, petitioner's re-sentencing

20  became final sixty days later, on November 12, 2011.  See Cal. R. Ct. 8.308(a).

21

22  [7]  The citation to In re Miller indicates that the California Supreme Court denied petitioner's
    January 8, 2013 petition because a prior petition "was based on the same grounds set forth in the
23  present petition" and since the time the prior petition was denied, "no change in the facts or the
    law substantially affecting the rights of the petitioner has been disclosed."  17 Cal. 2d at 735.
24
25  [8]  The date at the top of the instant petition is March 16, 2012, but the petition was received by
    this court on March 26, 2015.  (See ECF No. 1 at 1.)  Petitioner appears to have re-used the cover
26  page from his state habeas petition filed in the Solano Superior Court, and the date on the petition
    and proof of service were not updated.  (See ECF No. 1 at 33-34.)  However, petitioner's
27  accompanying letter is dated March 24, 2015.  (ECF No. 1-1 at 1.)  In an abundance of caution,
    the undersigned finds that the petition was filed on March 24, 2015, the date the accompanying
28  letter was signed.

For purposes of calculating the limitations period, the later date, November 12, 2011, controls. Under AEDPA, petitioner's conviction period began to run the following day, on November 13, 2011. See Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001) (the AEDPA limitations period begins to run on the day after the triggering event pursuant to Fed. R. Civ. P. 6(a)). Absent tolling, petitioner's last day to file his federal petition was on November 13, 2012. The instant petition, filed March 24, 2015, is therefore time-barred unless petitioner is entitled to statutory and/or equitable tolling.

III.    Statutory Tolling

Section 2244(d)(2) provides that "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the limitations period. 28 U.S.C. § 2244(d)(2). The statute of limitations is not tolled during the interval between the date on which a judgment of conviction becomes final and the date on which the petitioner files his first state collateral challenge because there is no case "pending" during that period. See Porter v. Ollison, 620 F.3d 952, 958 (9th Cir. 2010) ("The period between when direct review becomes final and the filing of a state habeas petition is not tolled[.]").

In general, the statute of limitations is tolled during the time after a state habeas petition has been filed, but before a decision has been rendered. Nedds v. Calderon, 678 F.3d 777, 780 (9th Cir. 2012). However, "a California habeas petitioner who unreasonably delays in filing a state habeas petition is not entitled to the benefit of statutory tolling during the gap or interval preceding the filing." Id. at 781 (citing Carey v. Saffold, 536 U.S. 214, 225-27 (2002)). Thus, "[t]he period between a California lower court's denial of review and the filing of an original petition in a higher court is tolled -- because it is part of a single round of habeas relief -- so long as the filing is timely under California law." Banjo v. Ayers, 614 F.3d 964, 968 (9th Cir. 2010). Generally, a gap of 30 to 60 days between state petitions is considered a "reasonable time" during which the statute of limitations is tolled. Evans v. Chavis, 546 U.S. 189, 210 (2006) (using 30 to 60 days as general measurement for reasonableness based on other states' rules governing time to appeal to the state supreme court); Carey, 536 U.S. at 219 (same). State habeas petitions filed

5

1    after the one-year statute of limitations has expired do not revive the statute of limitations and

2    have no tolling effect.  Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003) ("section

3    2244(d) does not permit the reinitiation of the limitations period that has ended before the state

4    petition was filed"); Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001).

5           In the instant case, the statute of limitations began to run on November 13, 2011.  The

6    limitations period ran for 123 days until it was tolled on March 16, 2012, when petitioner filed his

7    first state habeas petition in the Solano County Superior Court.  The statute of limitations

8    remained tolled while his petition was pending.  The petition was denied on June 1, 2012.

9    Because petitioner filed his second state habeas petition in the California Court of Appeal in July

10   2012, petitioner is entitled to tolling during the interval between the time his first petition was

11   denied and the time his second petition was filed, as well for the period his second petition was

12   pending before the Court of Appeal.  Similarly, because the Court of Appeal denied relief on

13   August 2, 2012, petitioner is entitled to statutory tolling for the period of March 16, 2012, through

14   August 2, 2012.

15          On October 22, 2012, petitioner filed a third state habeas petition in the California

16   Supreme Court.  Respondent cites to authority suggesting that petitioner is not entitled to interval

17   tolling for the time between the denial of the second petition on August 2, 2012, and the filing of

18   the third petition on October 22, 2012.[9]  (ECF No. 14 at 3-4.)  As discussed above, a gap of 30 to

19   60 days between state petitions is generally considered a "reasonable time" during which the

20   statute of limitations is tolled.  See Evans, 546 U.S. at 210.  Here, petitioner delayed by waiting

21   81 days once his second state habeas petition was denied before filing his third habeas petition.

22   Petitioner provides no explanation for the delay during this particular period.  (ECF Nos. 17, 22.)

23   Thus, the undersigned finds that 81 days constitutes unreasonable delay.  See Livermore v.

24   Sandor, 486 Fed. App'x 342 (9th Cir. 2012) (concluding that delay of 76 days between state

25   habeas petitions was unreasonable); Velasquez v. Kirkland, 639 F.3d 964, 968 (9th Cir. 2011)

26

27   [9]  Respondent states that petitioner may "arguably" be entitled to statutory tolling during this
     time, but that the federal petition remains untimely regardless of whether the limitations period is
28   tolled during this period.

1    (finding delays of 81 and 91 days were unreasonable); Stancle v. Clay, 692 F.3d 948, 956 (9th

2    Cir. 2012) (finding unjustified 82 day delay unreasonable), cert. denied, 133 S. Ct. 1465 (2013).

3    Accordingly, petitioner is not entitled to interval tolling for the time between the denial of his

4    second state habeas petition and the filing of his third state habeas petition, and the statute of

5    limitations ran for 81 days during this period.  Thus, by the time petitioner filed in the California

6    Supreme Court, 205 days of the limitation period had expired.

7         Petitioner's third habeas petition was filed on October 22, 2012, and denied by the

8    California Supreme Court on January 1, 2013.  Petitioner is entitled to statutory tolling for the

9    time his third petition was pending before the California Supreme Court.

10        On January 8, 2013, petitioner filed a fourth habeas petition, also in the California

11   Supreme Court, which was denied on May 1, 2013.  Respondent concedes that petitioner is

12   entitled to tolling during the pendency of his fourth state habeas petition, but asserts that

13   petitioner is not entitled to interval tolling for the time between the denial of the third petition and

14   the filing of the fourth petition.  As the undersigned finds that whether petitioner is entitled to

15   tolling during this five day period does not ultimately affect the court's tolling analysis, the

16   undersigned assumes that petitioner is entitled to interval tolling for this period.

17        Thus, petitioner is entitled to statutory tolling from October 22, 2012, through May 1,

18   2013, when the California Supreme Court denied petitioner's fourth state habeas petition.  The

19   limitations period began to run again on May 2, 2013, and expired 160 days later on October 8,

20   2013.  However, the federal petition was not filed until March 24, 2015; thus, the petition remains

21   untimely unless petitioner is entitled to equitable tolling.

22        IV.    Equitable Tolling

23        The one year statute of limitations for filing a habeas petition may be equitably tolled if

24   extraordinary circumstances beyond a prisoner's control prevent the prisoner from filing on time.

25   See Holland v. Florida, 560 U.S. 631, 645 (2010).  A petitioner seeking equitable tolling must

26   establish two elements:  "(1) that he has been pursuing his rights diligently, and (2) that some

27   extraordinary circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005).

28   An "extraordinary circumstance" has been defined as an external force that is beyond the

1  prisoner's control.  Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999).  "The diligence required

2  for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.'"

3  Holland, 560 U.S. at 653 (internal citations and additional quotation marks omitted).  Equitable

4  tolling is justified in few cases, and "the threshold necessary to trigger equitable tolling under the

5  AEDPA is very high, lest the exceptions swallow the rule."  Spitsyn v. Moore, 345 F.3d 796, 799

6  (9th Cir. 2003) (internal citation, quotation omitted).

7        Here, petitioner contends that he is entitled to equitable tolling based on his lack of access

8  to his legal materials at various times, petitioner's mental health status, and his reliance on writ

9  writers and/or his lack of legal sophistication.  The undersigned addresses each, in turn, below.

10        A.  Lack of Access to Legal Materials

11        In some cases, a petitioner's lack of access to his legal materials may constitute an

12  extraordinary circumstance warranting equitable tolling.  Ramirez v. Yates, 571 F.3d 993, 998

13  (9th Cir. 2009) (it is "unrealistic to expect a habeas petitioner to prepare and file a meaningful

14  petition on his own within the limitations period without access to his legal file."), quoting

15  Espinoza-Matthews, 432 F.3d at 1027-28.

16        1.  First Gap:  November 13, 2011 - March 16, 2012[10]

17        The undersigned first considers whether petitioner is entitled to equitable tolling for any of

18  the time before his first state habeas petition was filed on March 16, 2012.  The record includes a

19  number of letters from 2010 to 2012 regarding his access to legal materials and efforts to obtain

20  transcripts and legal files.  (ECF Nos. 14-2 at 84-100; 14-3 at 47-65 (duplicates).)

21        The letters reflect that in September of 2011, petitioner was out to court regarding a

22  modification of one of his enhancements.  Petitioner claims he did not have access to his legal

23  materials during this time.  (See ECF No. 1 at 70.)  In his supplemental opposition, petitioner

24  claims he was without his legal materials for three weeks after he was transferred to Corcoran on

25  March 9, 2011.  (ECF No. 22 at 2.)  Petitioner states he went to administrative segregation ("ad

---

26    [10]  On July 3, 2012, petitioner left A yard mainline for B yard, and was in orientation for 2 weeks

27  without his property (ECF No. 22 at 3); and the log documents such movement (ECF No. 22 at 7).  However, petitioner's state habeas petitions were pending during this period, for which he

28  received statutory tolling.  Thus, no equitable tolling is required.

1    seg") on August 18, 2011, transferred to court on September 9, 2011, arrived at San Quentin on

2    September 9, 2011, transferred back to Corcoran on October 5, 2011, and remained in ad seg until

3    October 25, 2011.  (ECF No. 22 at 2.)

4          However, because the statute of limitations did not begin to run until November 13, 2011,

5    petitioner's alleged lack of access to legal materials prior to November 13, 2011, does not affect

6    the limitations analysis because it occurred *before* the limitations period commenced.

7          In October of 2011, petitioner wrote to various courts, trial counsel, and appellate counsel,

8    in an apparent attempt to obtain transcripts and other documents.  (ECF No. 14-2 at 84-87.)  On

9    January 10, 2012, the Solano County Superior Court wrote petitioner, noting receipt of his

10   October 25, 2011 letter requesting copies of all <u>Marsden</u> motions, color photos of the robbery

11   scene, and exhibits 18 and 21.  (ECF No. 14-2 at 95-96.)  The superior court provided petitioner

12   with a letter explaining the procedure for obtaining copies of the <u>Marsden</u> motions, but noted that

13   the other items petitioner requested could not be provided.  (<u>Id.</u>)  The superior court forwarded

14   petitioner's request and the court's December 15, 2011 order denying his request, to petitioner's

15   counsel.  (ECF No. 14-2 at 96.)  On December 16, 2011, petitioner's trial counsel wrote petitioner

16   and confirmed that she previously sent petitioner his entire file, some of which she claimed was

17   previously sent on multiple occasions.  (ECF No. 14-2 at 97.)  She also provided copies of her

18   letters dated May 13, 2009, November 3, 2009, and November 18, 2009.  (<u>Id.</u>)  Petitioner wrote

19   his trial counsel again on January 17, 2012, noting receipt of her December 16, 2011 letter and its

20   enclosures, but denying receipt of other documents from counsel or her staff.  (ECF No. 14-2 at

21   98.)

22         In his supplemental opposition, petitioner claims that after his October 5, 2011 transfer

23   back to Corcoran, he remained in ad seg until October 25, 2011, before being placed on "C"

24   status and without property until December 24, 2011, "to the best of [petitioner's] recollection."

25   (ECF No. 22 at 2.)  Petitioner states he was diligent from December 24, 2011, until June 28,

26   2012.  (ECF No. 22 at 4.)

27         Respondent argues that petitioner's vague claims that he was without his legal materials

28   are insufficient because he fails to set forth specific dates, estimates periods of time, and

1   generalizes the reasons for the alleged deprivations.  (ECF No. 27 at 9.)  Even liberally accepting

2   petitioner's vague claims, respondent contends that only some part of the two months between

3   October 11 and December 24, 2011, would possibly qualify.  (ECF No. 27 at 9-10.)

4        The external movement logs for petitioner reflect no transfers between November 13,

5   2011, and March 16, 2012.  (ECF No. 22 at 7.)

6        It may be that petitioner is entitled to equitable tolling during part of this period.

7   However, the court finds it unnecessary to decide this question because even if petitioner were

8   entitled to equitable tolling from the time the limitations period began running on November 13,

9   2011, through the time his first state petition was filed on March 16, 2012, the federal petition is

10   still untimely, as explained below.

11        Including the time for statutory tolling, the statute of limitations period expired on

12   October 8, 2013.  If petitioner is entitled to equitable tolling from November 13, 2011, through

13   March 15, 2012, a period of 123 days, the limitations period would be extended from October 8,

14   2013, to February 10, 2014 (because February 8, 2014, was a Saturday).  But because the federal

15   petition was filed over one year later, on March 26, 2015, an additional 123 days in equitable

16   tolling would not save the petition.

17              2.  Second Gap:  August 2, 2012 - October 22, 2012

18        The external movements logs reflect no transfers or movements between July 3, 2012, and

19   October 22, 2012.  (ECF No. 22 at 6-7.)  As argued by respondent, petitioner provided no facts

20   supporting equitable tolling based on lack of access to legal materials from August 2, 2012,

21   through October 22, 2012, either in his opposition or supplemental opposition.  (ECF No. 17, 22.)

22   Thus, no equitable tolling for this 81 day period is warranted based on an alleged lack of legal

23   materials.

24              3.  Third Gap:  May 1, 2013 - March 24, 2015

25                   a.  May 1, 2013 - March 10, 2014

26        The external movements logs reflect no transfers between May 1, 2013, and December 13,

27   2013.  (ECF No. 22 at 6-7.)  The log shows two transfers on December 13, 2013:  one permanent

28   transfer from Corcoran to MCSP-Central Service, followed by a change in bed assignments in

1  MCSP Facilities A and C.  (ECF No. 22 at 6.)  Petitioner states that after his transfer he was in

2  orientation close to 3 weeks and had no legal materials.  (ECF No. 22 at 3.)  Petitioner's claim

3  that he was deprived of legal materials for three weeks based on his placement in "orientation," is

4  too vague without additional information to support equitable tolling.  But even if he were

5  granted an additional three weeks of equitable tolling, it would not save the petition because it

6  was filed over a year too late.  Moreover, because adding such three weeks would only extend the

7  limitations deadline to March 3, 2014, such tolling would not save the petition based on

8  petitioner's arguments concerning events that took place after March 10, 2014, because the

9  limitations period had already expired.

10                     b.  <u>March 11, 2014 - March 24, 2015</u>

11         As set forth above, even liberally applying equitable tolling for petitioner's alleged lack of

12  access to his legal materials, the limitations period expired on March 3, 2014, prior to the

13  expiration of the third gap.  Therefore, petitioner's placement in ad seg, transfer to Lancaster, and

14  lack of access to his legal materials occurring between March 11, 2014, and March 24, 2015, do

15  not affect the limitations analysis because they occurred *after* the statute of limitations expired on

16  March 3, 2014.  Accordingly, the petition remains time-barred absent equitable tolling for other

17  reasons.

18                     4.  <u>Identical Petitions</u>

19         Finally, as pointed out by respondent, the instant petition (ECF No. 1 at 1-34) looks

20  identical to the same petition he filed in the Solano County Superior Court and the California

21  Supreme Court (ECF No. 1 at 9-42).  Indeed, the instant petition bears the caption for the Solano

22  County Superior Court and was signed by petitioner on March 16, 2012.  (ECF No. 1 at 1, 32.)

23  Although there are minor differences in the exhibits, petitioner's allegations are identical.

24  Because the petitions are nearly identical, it is not reasonable that petitioner would require

25  additional time to file a petition that was already prepared.  See <u>Velasquez</u>, 639 F.3d at 968 (not

26  reasonable that Velasquez's counsel would need excess time essentially to re-file an already-

27  written brief); <u>see also</u> <u>Waldrip v. Hall</u>, 548 F.3d 729, 737 (9th Cir. 2008) (because "the

28  December 11 petition was nearly identical to the October 31, 2001 petition . . . counsel could

                                              11

1   easily have filed it sooner than December 2002."). Here, because petitioner essentially filed his

2   superior court petition with the federal court, he could have filed such petition any time after the

3   California Supreme Court denied his third state habeas petition on January 3, 2013, or after his

4   fourth state habeas petition was denied on May 13, 2013. But petitioner did not file the instant

5   petition until March 24, 2015.

6       Thus, petitioner fails to demonstrate that the asserted lack of access to his legal materials

7   was the cause of his untimeliness, where he filed the same petition here that he filed in the

8   superior court. Unless petitioner is entitled to equitable tolling for other reasons, his petition is

9   barred by the statute of limitations.

10      B. Mental Illness

11          1. Equitable Tolling Test

12      The Ninth Circuit has articulated a specific, two-part test for an equitable tolling claim

13   based on a petitioner's mental impairment:

> (1) *First,* a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control by demonstrating the impairment was so severe that either
>
> (a) petitioner was unable to rationally or factually to personally understand the need to timely file, or
>
> (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing.
>
> (2) *Second,* the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.

22   Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir. 2010) (citations omitted) (italics in original);

23   see also Orthel v. Yates, 795 F.3d 935, 938 (9th Cir. 2015) ("A petitioner seeking equitable

24   tolling on the grounds of mental incompetence must show extraordinary circumstances, such as

25   an inability to rationally or factually personally understand the need to timely file, or a mental

26   state rendering an inability personally to prepare a habeas petition and effectuate its filing.").

27      "The relevant question [is,] '[d]id the mental impairment cause an untimely filing?'"

28   Stancle, 692 F.3d at 959 (quoting Bills, 628 F.3d at 1100 n.3.) Bills provides further guidance for

12

1  applying its two-part test:

2
> [T]o evaluate whether a petitioner is entitled to equitable tolling, the
3
> district court must:  (1) find the petitioner has made a non-frivolous
> showing that he had a severe mental impairment during the filing
4
> period that would entitle him to an evidentiary hearing; (2)
> determine, after considering the record, whether the petitioner
5
> satisfied his burden that he was in fact mentally impaired; (3)
> determine whether the petitioner's mental impairment made it
6
> impossible to timely file on his own; and (4) consider whether the
> circumstances demonstrate the petitioner was otherwise diligent in
7
> attempting to comply with the filing requirements.

8  Bills, 628 F.3d at 1100-01.

9        A petitioner alleging a severe mental impairment during the filing period is not entitled to

10  an evidentiary hearing unless he or she makes "a good faith allegation that would, if true, entitle

11  him to equitable tolling."  Laws v. Lamarque, 351 F.3d 919, 921 (9th Cir. 2003) (remanding for

12  consideration of whether the petitioner's delayed filing was "attributable to psychiatric

13  medication which deprived petitioner of any kind of consciousness" where the petitioner had

14  demonstrated "evidence of serious mental illness" by attaching prison psychiatric and medical

15  records).  The district court must take care to ensure that the record regarding the petitioner's

16  mental illness is sufficiently developed to rule on the tolling issue.  See Chick v. Chavez, 518

17  Fed. Appx. 567, 568 (9th Cir. 2013) (remanding "for further development of the record as to

18  [petitioner]'s mental competency and, if necessary, an evidentiary hearing"); see Bills, 628 F.3d

19  at 1099-1100 (remanding where the petitioner was in the lowest percentile for verbal IQ, verbal

20  comprehension and working memory, and, according to clinical psychologists, was incapable of

21  inferential thinking necessary to complete a federal habeas form).  Nevertheless, "[w]here the

22  record is amply developed, and where it indicates that the petitioner's mental incompetence was

23  not so severe as to cause the untimely filing of his habeas petition, a district court is not obligated

24  to hold evidentiary hearings to further develop the factual record, notwithstanding a petitioner's

25  allegations of mental incompetence."  Roberts v. Marshall, 627 F.3d 768, 773 (9th Cir. 2010); See

26  also Orthel, 795 F.3d at 939-40.

27  ////

28  ////

13

1          2.  The Parties' Positions

2          Respondent argues that petitioner failed to meet his burden to demonstrate he is entitled to

3  equitable tolling on the basis of mental impairment because petitioner did not allege specific days

4  or periods during which he claims he was mentally impaired, or explain why his mental

5  impairment hindered his ability to timely re-file the identical petition he previously filed, or

6  provide mental health records demonstrating he was mentally impaired during the statutory

7  period.  (ECF No. 27 at 11, 13.)  Further, respondent contends that at numerous intervals

8  throughout the gaps in tolling, petitioner was examined, found to have coherent thought

9  processes, and had "no disabling mental disorders."  (ECF No. 27 at 13.)

10          In his opposition, petitioner alleges he was placed on an Enhanced Out Patient ("EOP")

11  program and given new medication for depression, that causes his thinking to be "distorted at

12  times."  (ECF No. 17 at 2.)  Petitioner states that the medications Trileptal and Zoloft

13  "sometimes" interfere with his short term memory and cause petitioner to have "jumbled

14  thoughts."  (ECF No. 17 at 2.)  In his declaration, petitioner states he was transferred to Lancaster

15  Prison around September of 2014 for mental health observation, and was put on EOP status;

16  when he signed the declaration on March 22, 2015, he was in the CCCMS.[11]  (ECF No. 17 at 6.)

17  Petitioner declares that he has been taking Trileptal for anxiety, depression, and PTSD for two to

18  three years, and is currently being prescribed Zoloft for depression.  (ECF No. 17 at 7.)

19          In his supplemental opposition, petitioner claims that his chronic pain and his mental

20  disorders, mixed with his medications, leave him "irritable, jumble-minded, and often unable to

---

21  [11]  "CCCMS" is an acronym for the Correctional Clinical Case Management System and inmates
22  designated to this level of care are those "whose symptoms are under control or in partial
   remission and can function in the general prison population, administrative segregation, or
23  segregated housing units."  Coleman v. Schwarzenegger, 2009 WL 2430820, *15 n.24 (E.D. Cal.
   2009).  Washington v. McDonald, 2010 WL 1999469 (C.D. Cal. Feb. 19, 2010).  The EOP level
24  of care is for inmates who suffer "Acute Onset or Significant Decompensation of a serious mental
   disorder characterized by increased delusional thinking, hallucinatory experiences, marked
25  changes in affect, and vegetative signs with definitive impairment of reality testing and/or
   judgment," and who are unable to function in the general prison population but do not require
26  twenty-four hour nursing care or inpatient hospitalization.  Coleman, 2009 WL 2430820, *15 n.
   24 (citation omitted).  The Mental Health Crisis Bed ("MHCB") Placement is "for inmates who
27  are markedly impaired and/or dangerous to others as a result of mental illness, or who are
   suicidal, and who require 24-hour nursing care."  Id. (citation omitted).
28

14

get out of bed." (ECF No. 22 at 1.)  In support of his supplemental opposition, petitioner provided letters, classification and mental health records, including medications and diagnoses, from September of 2011 to the present.  (ECF Nos. 22 at 9-52; 23.)  The undersigned summarizes the pertinent records herein.

### 3.  Mental Health Records & Other Documents

On September 6, 2011, petitioner reported he was in ad seg because he was charged with assault, then went to Mental Health Care Bed for two weeks because he became suicidal; "he has a problem in that he acts immature." (ECF No. 23 at 61.)  Petitioner's prescription to Citalopram Hydrobromide (Celexa, an antidepressant), 40 mg every morning, was stopped, and the Hydroxyzine parnoate (Vistaril), 50 mg every night, was renewed for 90 days, and he was prescribed Zoloft (antidepressant) 50 mg in the morning, for 90 days.  (ECF No. 22 at 45.)  Clinician J. Tatomer, M.D., diagnosed petitioner with anxiety disorder and PTSD (Axis I), with a GAF[12] of 60.  (ECF No. 23 at 61.)  Dr. Tatomer found petitioner's intellectual functioning to be average; memory intact; and orientation x 2.  (Id.)

On September 19, 2011, petitioner was seen by Dr. G. Sorosky, a psychiatrist.  (ECF No. 22 at 38, 52.)  Petitioner reported he was depressed, with some anxiety and panic attacks when

---

[12]  "GAF" is an acronym for "Global Assessment of Functioning," a scale used by clinicians to assess an individual's overall level of functioning, including the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed. 2004) ("DSM IV-TR").  A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school function (e.g, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  Id. A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers.)  Id.  A 41-50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in social, work, or school functioning.  A GAF of 31-40 indicates:  "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school.)"  Id. A GAF of 21-30 indicates:  "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  Id.

1    around large number of people, but full panic attacks "are rare." (ECF Nos. 22 at 38; 23 at 60.)

2    He did "not want to be separated from the rest of the population and this would be a bigger

3    stressor than staying CCCMS," and would ask for additional help if he became more hopeless,

4    suicidal or needed more support such as EOP.  (ECF No. 22 at 38.)  Petitioner was diagnosed

5    with depression; his Zoloft was increased from 50 to 100 mg., and Vistaril was continued at 100

6    mg for sleep; and he was continued in CCCMS.  (ECF No. 22 at 38.)

7         On September 23, 2011, petitioner reported that the increased Zoloft may have helped

8    "somewhat," but that his ad seg housing had added to his stress.  (ECF No. 22 at 52.)  Petitioner

9    denied having hallucinations, and no evidence of delusions was noted.  (Id.)  Petitioner reported

10   some improvement in mood and anxiety, but not significant.  Petitioner "adamantly denied" any

11   suicidal or homicidal ideation, and his insight and judgment were intact.  (ECF No. 22 at 52.)   He

12   was monitored daily in CCCMS from September 19, 2011, through September 25, 2011, but had

13   no further signs of distress.  (ECF No. 23 at 53.)

14        On September 29, 2011, petitioner reported that the 100 mg Zoloft prescription was not

15   enough.  (ECF No. 22 at 49.)  Petitioner denied any hallucinations, "indicated his mood was

16   down," but denied any suicidal or homicidal ideation.  (Id.)  Petitioner was CCCMS, and his

17   TABE[13] was noted as 12.9.  (Id.)

18        From October 3, 2011, through October 5, 2011, petitioner was monitored daily in

19   CCCMS, and no distress signs were noted.  (ECF No. 23 at 54.)

20        On October 12, 2011, petitioner was under the CCCMS level of care.  (ECF Nos. 22 at 48;

21   23 at 52.)  Upon his release from ad seg, petitioner said "he is a little delusional as a basis for

22   saying he has safety concerns.  Said he thought he saw an enemy."  (Id.)  But the doctor checked

23   the box finding that petitioner had no impaired thought process, and found petitioner "does not

24   have any mental health symptoms which would preclude his retention in his current living

25   environment."  (Id.)

26   _____

27   [13]  TABE stands for "Test of Adult Basic Education," which measures an inmate's ability to
     understand and participate in the disciplinary process.  See Cal. Code Regs., tit. 15, § 3000
     (defining "effective communication").  When an inmate has a TABE score of 4.0 or below, prison
28   staff must assess whether the inmate requires a Staff Assistant.  Id.

On December 28, 2011, an Interdisciplinary Treatment Team ("IDTT") documentation progress note reflects petitioner was provided treatment based on anxiety/depression and was actively participating in the CCCMS level of care.  (ECF No. 23 at 55.)

Petitioner provided no mental health records for 2012.

On April 11, 2013, in a mental health evaluation performed by S. Rosier, Psy.D., petitioner's functional impairment was listed as moderate for mental illness symptoms, and medical and behavioral control; mild for interpersonal.  (ECF No. 22 at 31.)  He was diagnosed as Bipolar DO (Axis I), and Antisocial Personality DO, and Borderline Personality DO (Axis II), with a GAF score of 60, and met the criteria for CCCMS.  (ECF Nos. 22 at 31; 23 at 48-51.)  Dr. Rosier marked petitioner's thought processes as within normal limits, and by perception, Dr. Rosier wrote petitioner first heard voices in his head "a few days ago -- never before."  (ECF No. 23 at 51.)  Petitioner reported no use of substances; the voices told him to "cut on [himself.]"

Dr. Rosier found petitioner's cognition to be within normal limits, noting he is of "average intelligence" per his responses, with a "TABE of 12.9, NCF, HS grad, College courses."  (ECF No. 23 at 51.)  Petitioner's insight and judgment were within normal limits, and Dr. Rosier noted petitioner was compliant with all activities of daily living, and accesses staff appropriately for needed resources (medical, dental, etc.).  (ECF No. 23 at 51.)

On April 11, 2013, Dr. Rosier completed handwritten interdisciplinary progress notes: petitioner's thoughts were "organized, linear (backed down on [auditory hallucinations])," and his affect was calm, alert, and stable.  (ECF No. 22 at 39.)  Petitioner was retained in CCCMS.  (Id.)

A Mental Health Treatment Plan from an April 17, 2013 IDTT reflects a diagnosis of Bipolar DO (Axis I); ASPD ("Antisocial Personality Disorder") and Borderline Personality DO (Axis II), with a GAF of "60 Moderate symptoms of a bipolar/Mood DO affecting Cog/Social functioning."  (ECF No. 23 at 45.)  Petitioner's TABE was "12.9, NCF HS Diploma 2 College AA degrees."  (ECF No. 23 at 45.)

On October 29, 2013, S. Rosier, MAC, Psy.D., described petitioner as articulate; his thoughts were organized and linear.  (ECF No. 23 at 36.)  He was diagnosed as Bipolar, DO, NOS (Axis I); ASPD and borderline personality, DO (Axis II), with a GAF of 60.  (ECF No. 23 at 36.)

Dr. Rosier noted "moderate symptoms of a bipolar/Mood DO affecting cognitive/social functioning," and retained petitioner in CCCMS  (ECF No. 23 at 36.)

On December 13, 2013, petitioner's new arrival form notes petitioner is CCCMS.  (ECF No. 22 at 44.)

On March 14, 2014, petitioner received a mental health referral, noting his history of psychiatric care needed re-assessment, "poor appetite, nervous," and increased anxiety.  (ECF No. 23 at 35.)  The word "unstable," is handwritten across the form, but without attribution.  (ECF No. 23 at 35.)

On May 19, 2014, "due to ongoing physical pain and anger due to reported lack of relief with recent change in medication," petitioner "used a fork to puncture his arm resulting in a superficial wound."  (ECF No. 23 at 42.)  On May 21, 2014, petitioner told H. Parks, Psy. D., that petitioner "was feeling pain in my neck at the time and wanted to try and transfer the pain somewhere else."  (Id.)  Dr. Parks marked all areas of cognition within normal limits, noting under "fund of information" that petitioner's TABE score was 12.9, "Clark NCF.  Varied reports of GED vs. High School Diploma.  History of special ed."  (ECF No. 23 at 38.)  Dr. Parks noted petitioner's intellectual functioning was "adequate.  Likely in the low average to average range." (Id.)  Petitioner had no delusions, obsessions or magical thinking, but his thought processes were described as "hypervigilance and paranoid ideation.  Catastrophic thinking.  Irrational interpretations of others words/gestures.  Pattern of distorted cognitions and hypersensitivity to environmental cues."  (ECF No. 23 at 38.)  Dr. Parks recommended that petitioner be brought into the Mental Health Department at the CCCMS level of care.  (ECF No. 23 at 42.)

The Interdisciplinary Treatment Team - Level of Care Decision dated May 21, 2014, marked the "yes" box stating that "as a result of a major mental disorder, [petitioner] [was] unable to adequately function at the current level of care," and transferred him to the CCCMS level of care.  (ECF No. 23 at 46.)  The remaining boxes were marked "no," including in response to the question whether petitioner demonstrated chronic psychiatric symptoms such as disturbed emotions, perceptions, thought processes, or impaired cognitions, that had not responded sufficiently to at least six months of treatment.  (ECF No. 23 at 46.)

Dr. Parks noted petitioner's thought process/content was coherent, linear, and goal-directed; diagnosis was Adjustment Disorder with mixed anxiety and depressed mood, chronic; rule out posttraumatic stress disorder, chronic (provisional) and rule out bipolar disorder, NOS, by history (Axis I).  (ECF No. 23 at 30.)  His Axis II diagnosis was Antisocial Personality Disorder; Narcissistic personality disorder, by history; borderline personality disorder, by history, and rule out paranoid personality disorder; GAF was 55.  (ECF No. 23 at 30, 47.)  Petitioner would receive "psychiatry appointments at regular intervals to address anxiety/PTSD symptoms, effective communication skills, mood instability (currently has an external locus of control where he thinks others directly influence his moods), and depression," at the CCCMS level of care.  (ECF No. 23 at 30.)  Petitioner had moderate psychological functional impairment.  (ECF No. 23 at 47.)[14]

On May 22, 2014, petitioner was prescribed Trileptal 600 bid.  (ECF No. 22 at 43.)  No other medications were marked.  (Id.)

On June 3, 2014, petitioner was seen in general psychiatry, under EOP level of care.  (ECF No. 22 at 42.)  Petitioner was described as a 40 year old with a history of adjustment disorder, anxiety and depression.  (Id.)  He was taking Trileptal 600 mg bid, but claimed better mood stability at 1200 bid in the past.  He denied having hallucinations or suicidal ideation.   His TABE was 12.9.  (Id.)  A medication reconciliation form shows that his prescription for Oxcarbazepine (Trileptal) 600 mg was stopped, and on June 3, 2014, he was prescribed 900 mg Trileptal for 7 days, then increased to 1200 mg for 30 days.  (ECF No. 22 at 46.)

On June 12, 2014, petitioner reported he was "not too well, I've been in a depressive state," and complained that his pain medications were not working.  (ECF No. 22 at 32.)  Dr. Parks found petitioner's mood was mildly depressed and frustrated, but "did not display any signs

---

[14]  The record reflects petitioner's suicide attempts as 1992 overdose on aspirin; 1993/1997 overdose on mental health medication; 2012 cut wrists; and on May 19, 2014, scratched his arm with a fork due to physical pain.  (ECF No. 23 at 31; 42; 45.)  However, on May 21, 2014, petitioner "adamantly denied" cutting his wrists while at San Quentin in 2012.  (ECF No. 23 at 42.)  In addition, he denied any suicide attempts or suicidal bodily injury other than the 1994 overdose (reported variously as occurring in 1992-1997), stating "Sometimes I do that when I need someone to talk to.  For attention."  (ECF No. 23 at 42.)

of impaired cognitive functioning," was attending to his activities of daily living, his attention and concentration were within normal limits, and "his thought process was clear, coherent, and goal-directed." (ECF No. 22 at 32.)  Dr. Parks found "evidence of numerous cognitive distortions and he has a tendency to make inaccurate meaning of this writer's comments and gestures.  He tends to overanalyze comments and displays a general hypervigilance." (ECF No. 22 at 32.)  Petitioner denied perceptual disturbances, suicidal ideation plan or intent.  (Id.)

On July 10, 2014, at 1300, petitioner received a mental health referral form for a superficial cut on petitioner's left wrist.  (ECF No. 23 at 33.)  At 1600, his GAF was recorded as 45 by A. Ferguson, Ph.D.  (ECF No. 23 at 34.)  On July 10, 2014, at an unknown time, Licensed Clinical Social Worker ("LCSW") Towner evaluated petitioner's mental health:

> [Petitioner's] current agitation, anger, and frustration regarding his wants (change in PC, wants EOP) not being immediately gratified, combined with poor coping skills, impulsivity, and willingness to harm himself to bring attention & gratify needs appear to raise acute risk to high at this time.  Should [petitioner] calm, engage, & process risk could decrease.

(ECF No. 23 at 39.) Towner noted petitioner's GAF at 50.

On September 22, 2014, petitioner reported he was going to kill himself if returned to ad seg because he couldn't handle another lengthy placement in ad seg. (ECF No. 23 at 32.)  The LCSW found petitioner was oriented x 3 with linear thought processes, no psychotic symptoms, presented as anxious and reported depression due to being in ad seg again.  (ECF No. 23 at 32.)  The LCSW recorded petitioner's GAF as 35.  (Id.)

On January 8, 2015, petitioner was at the CCCMS level of care, and his continued ad seg placement was "increasingly stressful." (ECF No. 23 at 41.)

On January 29, 2015, petitioner's GAF was noted as 58.  (ECF No. 23 at 18; 40.)

On March 3, 2015, D. Lisle, Ph.D., noted petitioner is articulate and intelligent.  (ECF No. 23 at 27.)  Denied any hallucinations or homicidal or suicidal ideation; stated he was doing better since "getting rid of a problematic cellie." (Id.)  He reported some suicidal history but currently stable.  (Id.)  He would continue in CCCMS.  (Id.)

////

20

1      On May 19, 2015, petitioner was CCCMS, his TABE was listed as 4.9.  (ECF No. 23 at

2   26.)

3      On November 22, 2015, petitioner missed 50% of his medication.  (ECF No. 23 at 17.)

4      On January 22, 2016, petitioner was EOP, and his axis 1 diagnosis was Mood DO, Axis II

5   diagnosis was ASPD, with a GAF of 65.  (ECF No. 23 at 10.)

6      On November 15, 2016, petitioner was seen by Clinician S. Amin, Ph.D., who noted, per

7   record review, that his axis 1 diagnosis was Mood DO, Axis II diagnosis was ASPD, with a GAF

8   of 64, and TABE 8.4.  (ECF No. 23 at 3.)

9          4.  Discussion

10      After carefully considering the record, for the reasons stated below, the undersigned finds

11   that petitioner is not entitled to equitable tolling based on mental illness.  Petitioner has not

12   demonstrated that he suffered from a severe mental impairment during the limitations period that

13   rendered him unable to rationally or factually understand the need to timely file his federal

14   petition or that rendered him unable to prepare, or obtain assistance in preparing, his federal

15   petition.

16          a.  Gaps in Limitations Period

17      Initially, the undersigned examines petitioner's evidence as it applies to his mental health

18   concerns during the gaps in the limitations period.  As discussed above, with statutory tolling, the

19   one year limitations period began to run on November 13, 2011.  Petitioner suffered suicidal

20   ideation on June 17, 2011, and was transferred to Corcoran Facility 03A and Central Service due

21   to his anxiety and depression.  (ECF No. 22 at 2, 7.)  Petitioner was released on June 22, 2011.

22   Petitioner might be entitled to equitable tolling for this five day period, but it occurred prior to the

23   commencement of the limitations period on November 13, 2011.

24      The first gap in the limitations period ran from November 13, 2011, to March 16, 2012.

25   However, petitioner provided only one medical record, dated December 28, 2011, which reflects

26   that petitioner was actively participating in the CCCMS level of care, receiving treatment for

27   anxiety and depression.  (ECF No. 23 at 55.)  This record does not support a finding that

28   petitioner was severely impaired during the first gap in the limitations period.

In connection with the second gap, from August 2, 2012, to October 22, 2012, petitioner provided no medical records.

Finally, as to the third gap, from May 1, 2013, to March 3, 2014, petitioner provides one medical record reflecting an episode of auditory hallucinations on April 11, 2013, shortly before the third gap began.  However, despite petitioner's self-report, Dr. Rosier found petitioner's thoughts were "organized, linear (backed down on [auditory hallucinations])," and his affect was calm, alert, and stable.  (ECF No. 22 at 39.)  Moreover, on April 17, 2013, petitioner was noted to have moderate symptoms affecting cognitive and social functioning, as he was on October 29, 2013.  In addition, petitioner's GAF was listed as 60 during this third gap period, confirming such moderate symptoms.

Finally, as discussed above, with statutory tolling, the one year limitations period expired on October 8, 2013.  Even if petitioner were liberally granted equitable tolling for the lack of access to his legal materials described above, the latest the limitations period would expire was March 3, 2014.  Petitioner claims he was on suicide watch from September 24, 2014, until he returned to EOP status at Mule Creek on October 6, 2014.  (ECF No. 22 at 3.)  However, because the limitations period expired on March 3, 2014, petitioner is not entitled to equitable tolling for mental health crises that occurred after March 3, 2014.

b. Psychiatric Medications

The court turns now to petitioner's claim that his antidepressant medications warrant equitable tolling.  Petitioner claims that for the past two to three years, he has been taking Trileptal for anxiety, depression, and PTSD, and Zoloft for depression, and that such medications "sometimes" interfere with his short term memory, distorts his thinking at times, and cause petitioner to have "jumbled thoughts," or be "jumble-minded."  In this court's further briefing order, petitioner was directed to address these allegations, to explain when he started taking each medication and for what periods of time he was unable to file his federal habeas petition as a result of the medications' side effects.  (ECF No. 18 at 3.)  Despite this order, petitioner failed to address such issues in his supplemental opposition.  Rather, he states that his chronic pain and mental disorders mixed with his medications leave him irritable, jumble minded and often unable

22

1    to get out of bed.  (ECF No. 22 at 1.)  Petitioner does not identify when he began taking each

2    medication or when he suffered such side effects.

3            Petitioner's prescriptions to Zoloft were noted on September 6, 2011, September 23, 2011,

4    and September 29, 2011.  In his October 4, 2011 letter to the Solano County Superior Court,

5    petitioner stated he was "finding it very hard to concentrate on filing a petition for habeas

6    corpus."  (ECF No. 1 at 101.)  At that time he had been housed at San Quentin for two weeks, and

7    in ad seg for seven months.  (ECF Nos. 1 at 101; 22 at 7.)  He did not attribute the inability to

8    concentrate to his medication, and the mental health records do not reflect that petitioner

9    complained to his mental health care providers that Zoloft or any other medication caused him

10   such side effects.

11           Also, the first record of a Trileptal prescription is May 22, 2014, after the statute of

12   limitations period expired.  Petitioner claims he was placed on the EOP program and given new

13   medication for depression.  However, the record reflects petitioner was not placed on EOP until

14   June 3, 2014, after the limitations period expired.  Rather, it appears that throughout the

15   limitations period petitioner was treated at the CCCMS level of care until June 3, 2014.

16   Treatment at the CCCMS level of care "suggests that petitioner was able to function despite his

17   mental health problems."  Washington, 2010 WL 1999469, at *2 (citing Coleman, 922 F. Supp.

18   2d at 903 n.24 (inmates designated to the CCCMS level of care "are those 'whose symptoms are

19   under control or in partial remission and can function in the general prison population,

20   administrative segregation, or segregated housing unit'")).

21           Importantly, petitioner fails to pinpoint when he suffered the alleged side effects, or how

22   such side effects impaired his ability to timely file his federal petition.  Rather, he claims the

23   medications "sometimes" interfered with his short term memory, and "at times" distorted his

24   thinking.  Such intermittent interference is insufficient, without more, to demonstrate the

25   medications severely impaired his ability throughout the limitations period.  The record reflects

26   that petitioner was able to file four state habeas petitions, as well as various letters to courts and

27   his prior attorneys, even while taking medication.  Accordingly, the undersigned cannot find that

28   petitioner's medications prevented him from understanding the need to file a timely petition, or

1    made it impossible for him to do so.

2                       c.  Analysis & Conclusion

3           Viewing the mental health records in their entirety, petitioner adduced evidence that he

4    suffers from various mental impairments such as bipolar disorder, adjustment disorder, and

5    PTSD.  However, the records do not reflect that petitioner suffers from such a severe impairment

6    that he was unable to understand the need to prepare and file his federal habeas petition.  Mental

7    health professionals often described petitioner's thoughts as organized and linear.  He was

8    described as having average intelligence.  Petitioner was able to communicate clearly with

9    medical staff, and even articulate when he believed he needed additional medication.  The record

10   reflects that he faced suicidal ideation twice in the nineties, and again in 2012 and 2014, but it

11   was not a constant or even frequent occurrence.  (See n.14 infra.)  Petitioner knew when to seek

12   treatment for his depression and anxiety, and sought treatment appropriately.  Such records

13   demonstrate that petitioner's mental impairments were not so severe that they made it impossible

14   for petitioner to timely file his federal habeas petition, either on his own or with assistance.

15          The record does reflect that petitioner's mental state deteriorated by May 19, 2014, when

16   he used a fork to puncture his arm resulting in a superficial wound, or July 10, 2014, when his

17   GAF was recorded as 45 after he was seen for a superficial cut to his wrist.  His GAF was

18   recorded as 35 on September 22, 2014, and 58 on January 29, 2015, returning to 65 on January

19   22, 2016, and 64 on November 15, 2016.  However, by May 19, 2014, the limitations period had

20   expired.

21          In any event, even if petitioner's mental illness was so severe as to meet the first prong of

22   Bills, petitioner failed to support his claim of diligence.  Petitioner "must diligently seek

23   assistance and exploit whatever assistance is reasonably available."  Bills, 628 F.3d at 1100.  A

24   petitioner may satisfy the diligence prong if "the petitioner's mental impairment prevented him

25   from locating assistance or communicating with or sufficiently supervising any assistance

26   actually found."  Id.  But, as the Supreme Court noted in Holland, the diligence requirement is not

27   maximum diligence but rather reasonable diligence.  560 U.S. at 653.  Thus, the court must

28   examine whether, given petitioner's impairments, he was sufficiently diligent.

                                          24

1    Here, petitioner asserts that he pursued his rights diligently, and the "impediments" are not

2  simply a pretext for lack of diligence.  (ECF No. 17 at 3.)  However, petitioner alleged no facts

3  showing that he attempted to obtain assistance in order to file a timely petition, or that his alleged

4  mental impairments prevented him from locating or communicating with others for assistance.

5  Instead records reflect that petitioner sought such legal assistance, filed four state habeas

6  petitions, in three different courts, raising substantive legal challenges.  That petitioner may have

7  been assisted by another inmate during this period does not change the analysis.  Petitioner

8  apparently knew how to ask for help, as his other state habeas petitions were filed and progressed

9  through the courts.  Indeed, in his supplemental opposition, petitioner states that he has "always

10  had prison (inmate) legal assistance."[15]  (ECF No. 22 at 1.)  See Roberts, 627 F.3d at 773 (mental

11  incompetence did not cause untimeliness where petitioner filed several petitions in state court

12  during time for which he sought equitable tolling).

13    In addition, petitioner wrote letters inquiring about his case and seeking relevant

14  documents.  (ECF No. 1 at 101 (October 4, 2011), 112 (October 25, 2011); No. 14-3 at 55

15  (October 15, 2011); 58 (December 2, 2011); 62-64 (January 17, 2012).)  For example, in his

16  October 4, 2011 letter, petitioner asked for a stay or for an extension of time to file his habeas

17  petition.  (ECF No. 1 at 101.)  All of these letters, as well as his state habeas petitions, support the

18  court's finding that petitioner was aware of the need to pursue habeas corpus relief, understood

19  the need to timely file his petition, as evidenced by his letters asking where his petition was, what

20  court was it in, and what was the status, and he was also able to obtain assistance to do so.  See,

21  e.g., Yeh v. Martel, 751 F.3d 1075, 1078 (9th Cir. 2014) (although petitioner had history of

22  mental illness, it was not severe enough to cause his delay because he repeatedly "sought

23  administrative and judicial remedies, and throughout these proceedings showed an awareness of

24  basic legal concepts."); Stancle, 692 F.3d at 959 (prisoner failed to demonstrate diligence in

25  pursuing claim and that his mental disorder made it impossible to meet federal deadline where

26

---

27  [15] Petitioner added that such assistance "is no longer available," suggesting a recent turn of
events.  But in any event, petitioner does not argue that he was unable to obtain assistance to
28  prepare the instant petition.  (ECF Nos. 17, 22.)

1    petitioner had continual assistance of his jail house lawyer in filing both his federal and state

2    habeas corpus petitions).

3         Petitioner must do more than simply assert his mental impairments to establish that he is

4    entitled to equitable tolling.  Review of the medical records demonstrate that petitioner was able

5    to communicate clearly with medical professionals.  Records also reflect that petitioner, either by

6    himself, or with assistance, was able to file habeas petitions.  Aside from his general statement

7    that his chronic pain and mental disorders mixed with his medications leave him irritable, jumble-

8    minded, and often unable to get out of bed, (ECF No. 22 at 1), petitioner alleged no facts

9    demonstrating a causal connection between his alleged mental illness and his inability to file a

10   timely petition before the limitations period expired.  "Without any allegation or evidence of how

11   petitioner's symptoms actually caused him not to be able to file despite his diligence, the court

12   cannot find that he is entitled to equitable tolling."  Taylor v. Knowles, 2009 WL 688615, at *6

13   (E.D. Cal. March 13, 2009), aff'd, 368 Fed. Appx. 796 (9th Cir. 2010) (no equitable tolling where

14   petitioner failed to show his auditory hallucinations, severe depression, and anxiety "actually

15   caused him not to be able to file despite his diligence"); see Howell v. Roe, 2003 WL 403353, *4

16   (N.D. Cal.  Feb. 20, 2003) (rejecting equitable tolling where petitioner's suicidal nature and

17   depression did not make him mentally incompetent).  Here, petitioner failed to demonstrate that

18   his mental impairments prevented him from filing this action before March 3, 2014.

19        Because the record is sufficiently developed for the undersigned to conclude that

20   petitioner's mental illness was not so severe as to cause the untimely habeas petition,[16] petitioner

---

[16] As respondent noted, petitioner did not claim that there were missing records that could further
aid his case. (ECF No. 27 at 14 n.2.)  Petitioner also did not submit any mental health records for
2012, which was part of the limitations period.  However, in his supplemental opposition,
petitioner states that he pursued his case diligently from December 24, 2011, until June 28, 2012,
when he was returned to ad seg.  (ECF No. 22 at 4.)  The record confirms that he was filing state
habeas petitions throughout 2012, and on January 8, 2013.  Petitioner's concession that he was
pursuing his case, in tandem with his multiple court filings, suggest his mental impairment was
not severe and did not prevent him from court filings in 2012.  In any event, petitioner received
statutory tolling for most of 2012, and the court granted petitioner 123 days of equitable tolling
from November 13, 2011, to March 16, 2012, for his alleged lack of legal materials.  The
remaining 81 days for the second gap from August 2, 2012, to October 22, 2012, would not save
the petition, which was filed over a year too late.  For all of these reasons, no additional
documentary evidence is required for 2012.

26

1    is not entitled to an evidentiary hearing.  Accordingly, for the reasons discussed above, the

2    undersigned finds that petitioner is not entitled to equitable tolling based on mental illness.

3            C.  Writ Writers and/or Lack of Legal Sophistication

4            Finally, the court notes that the reason petitioner did not file a petition at an earlier date

5    may have been in part because he was frequently unaware of the status of his case.  Attached to

6    the petition is a letter to the court, dated March 24, 2015, in which petitioner inquired as to

7    whether the court "had [his] writ on stay while the lower courts reviewed it."  (ECF No. 1-1 at 1.)

8    Petitioner indicates that Kenneth Moyer, an inmate at Solano County Prison, was "working on it,"

9    but that they have since "parted ways."  (See id.)  Also, on January 16, 2014, petitioner wrote to

10   the California appellate court, which informed petitioner on February 18, 2014, that his habeas

11   petition was denied on August 2, 2012.  (ECF No. 1-1 at 2.)  In his opposition, petitioner states

12   that in January 2015, he was concerned about his "tolled time," and sent letters and requests for

13   the status of his habeas case and "tolled time" to the courts, but was told they did not have his

14   case. (ECF No. 17 at 7.)  He claims he wrote the county courts as well as Sacramento, but finally

15   received a reply from this court.  (Id.)

16           In his supplemental opposition, petitioner states that he has "always had prison (inmate)

17   legal assistance," but was addressing the supplemental briefing order himself because "assistance

18   is no longer available."  (ECF No. 22 at 1.)  Petitioner also states that he tried from March 11,

19   2014, until January 9, 2015, to obtain docket numbers, abstracts, and "habeas corpus," from

20   correctional officers, apparently to no avail.  (ECF No. 22 at 3.)

21           Several courts have rejected claims of equitable tolling based on difficulties with writ

22   writers.  In Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000), the Tenth Circuit Court of

23   Appeals rejected an inmate's claim that he was entitled to equitable tolling for the period of time

24   the writ writer was preparing the petition.  The Court held that "the fact that an inmate law clerk

25   was drafting the state petition does not relieve Mr. Marsh from the personal responsibility of

26   complying with the law."  In United States v. Cicero, 214 F.3d 199, 204 (D.C. Cir. 2000), the

27   movant had relied on a writ writer whose placement in segregation "separated [petitioner] and his

28   papers for some time before the expiration of the one year grace period until after the filing

27

1   deadline had passed."  The court found this assertion an insufficient basis for equitable tolling,

2   because movant "entrusted [the writ-writer] with his legal documents at his peril."  Id. at 205.

3   Finally, in Nguyen v. Yates, 2010 WL 2569246, at *10-11 (C.D. Cal. Apr. 29, 2010), the court

4   held that "any contention that petitioner received inadequate assistance from other inmates in

5   connection with his habeas efforts could not suffice to show an extraordinary circumstance."

6   Quoting Henderson v. Johnson, 1 F.Supp.2d 650, 655 (N.D. Tex. 1998), the court observed:

7
8
> [I]f this court were to approve the ground on which [the petitioner]
> relies, it would materially ease the high standard necessary to toll
> AEDPA's limitation period, thereby undermining Congress'
> expressed desire to accelerate the federal habeas process . . . .

9

10
11
> Inmates who assist other prisoners with legal matters are not subject
> to the ethical and fiduciary obligations of lawyers. If their
> miscreant, inept or negligent conduct were deemed sufficient of
> itself to toll the AEDPA limitations period, the time-bar would be
> rendered virtually meaningless.

12   Id.

13       Here, petitioner does not identify any misconduct by Mr. Moyer, but merely claims they

14   parted ways.  Moreover, the record suggests Mr. Moyer's involvement as late as January 8, 2013,

15   when he signed the proof of service appended to petitioner's fourth state habeas petition.  (ECF

16   No. 14-3 at 9.)  Petitioner does not address when Mr. Moyer became unavailable, and petitioner's

17   inquiries in January and on March 24, 2015, long after Mr. Moyer's January 8, 2013 involvement,

18   are insufficient to demonstrate that Mr. Moyer was the extraordinary cause for petitioner's failure

19   to timely file his federal petition.  In addition, absent facts not present here, petitioner's March 24,

20   2015 letter, written long after the limitations period had expired, does not reflect petitioner's

21   diligence on his own behalf.  Moreover, the record reflects petitioner's ability to obtain legal

22   assistance or, in the alternative, to inquire as to the status of his case or seek documents.

23   Petitioner does not recount any efforts to obtain assistance once he and Mr. Moyer parted ways,

24   or during the relevant limitations period.  Thus, petitioner has failed to demonstrate he is entitled

25   to equitable tolling based on his reliance on writ writers.

26       To the extent that petitioner contends that the extraordinary circumstance was his lack of

27   legal sophistication or understanding of the law, his claim for equitable tolling must fail.

28   Rasberry v. Garcia, 448 F.3d 1150, 1154 (9th Cir. 2006) (pro se petitioner's ignorance and

1   confusion about the law not sufficient); <u>see, e.g.</u>, <u>Hughes v. Idaho State Bd. of Corr.</u>, 800 F.2d

2   905, 909 (9th Cir. 1986) (pro se prisoner's illiteracy and lack of knowledge of law unfortunate but

3   insufficient to establish cause).

4          Petitioner has failed to demonstrate he is entitled to equitable tolling on the basis of his

5   reliance on writ writers or his lack of legal sophistication.

6          V.       <u>Conclusion</u>

7          With statutory tolling, the one year limitations period began to run on November 13, 2011,

8   and expired on October 8, 2013.  Liberally applying equitable tolling for petitioner's alleged lack

9   of access to his legal materials, the limitations period expired, at the latest, on March 3, 2014.

10  Petitioner is not entitled to additional equitable tolling.  Therefore, the petition, filed on March 24,

11  2015, was filed over a year after the limitations period expired.  Respondent's motion to dismiss

12  should be granted.

13         Accordingly, IT IS HEREBY RECOMMENDED that:

14         1.  Respondent's motion to dismiss (ECF No. 14) be granted; and

15         2.  Petitioner's application for a writ of habeas corpus be dismissed.

16         These findings and recommendations are submitted to the United States District Judge

17  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

18  after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties.  Such a document should be captioned

20  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

21  he shall also address whether a certificate of appealability should issue and, if so, why and as to

22  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

23  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

24  § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after

25  service of the objections.  The parties are advised that failure to file objections within the

26  ////

27  ////

28  ////

1   specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

2   F.2d 1153 (9th Cir. 1991).

3   Dated:  February 21, 2017

4

5   _____
    KENDALL J. NEWMAN
6   UNITED STATES MAGISTRATE JUDGE

7   pete0689.mtd.sol.hc

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28